IN THE UNITED STATE DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


MAYFORD TIPTON, JR.,       )
        )
        )   No. 3:04-0548
    v.       )
        )   Judge Nixon
MICHAEL J. ASTRUE     )   Magistrate Judge Griffin
Commissioner of Social Security,[1]  )



To:   The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review

of the final decision of the Secretary of Health and Human Services denying Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social

Security Act (the "Act").

Upon review of the administrative record as a whole, the Court finds that the

Commissioner's determination that the plaintiff was not disabled under the meaning of the

Act is not supported by substantial evidence in the record as required by 42 U.S.C. § 405(g),

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of the Social Security Administration.

-1-

and this case should be remanded for further action in accordance with the recommendations contained herein.

## I. INTRODUCTION

The plaintiff filed an application for DIB and SSI dated April 15, 1993, alleging disability beginning on September 25, 1991. (Tr. 31-35, 64.) The plaintiff was found not disabled within the meaning of the Act on July 14, 1993. (Tr. 47-48.) Upon the plaintiff's request for reconsideration, the plaintiff's claim was denied on October 13, 1993. (Tr. 73.) After a hearing before an Administrative Law Judge ("ALJ") on January 25, 1995 (Tr. 308-61), the ALJ issued an unfavorable decision on August 25, 1995. (Tr. 16-25.) On January 14, 1997, the Appeals Council denied the plaintiff's request for review of the ALJ's decision. (Tr. 4-5.)

The plaintiff appealed to this Court, see *Tipton v. Apfel*, 3:97-0300, and upon the defendant's unopposed motion, this Court remanded the plaintiff's case to the Commissioner on January 29, 1998. (Tr. 480.) The Appeals Council issued an order on May 22, 1998, vacating the decision dated August 25, 1995, and remanding the case for the ALJ to "consider further the [plaintiff's] subjective complaints and the side effects of his medications and to obtain further testimony from a vocational expert, considering all of the

-2-

[plaintiff's] exertional and nonexertional limitations which [were] established by the record." (Tr. 478.)

In the meantime, in January of 1997, the plaintiff filed a second application for DIB and SSI benefits alleging disability since September 23, 1991. (Tr. 591, 906-08.) The plaintiff was again found not disabled within the meaning of the Act on April 4, 1997. (Tr. 566-722.) The plaintiff's claim was denied again upon reconsideration on December 16, 1997. (Tr. 580-82.)

The plaintiff's January 1997 claim was then consolidated with the remanded claim, and a second hearing was held before an ALJ on August 17, 1998. (Tr. 966-1060.) The ALJ issued an unfavorable decision on March 22, 1999. (Tr. 948-58.) The plaintiff appealed, and the Appeals Council denied the plaintiff's request for review on July 9, 1999. (Tr. 362-63.) The plaintiff again appealed the decision to this Court, *see Tipton v. Apfel*, 3:99-0892, and this Court remanded the case pursuant to the parties' joint motion on April 4, 2000. (Tr. 1075.) The Appeals Council issued an order on November 2, 2000, vacating the decision dated March 22, 1999, and remanding the case for further consideration. (Tr. 1077-78.)

On remand for the ALJ to "obtain updated medical evidence, review residual capacity and allegations of pain, and obtain additional vocational expert testimony if needed," a third hearing before an ALJ was held on June 20, 2002. (Tr. 935, 1075.) The ALJ incorporated by reference the summaries of the medical evidence in the two previous

-3-

decisions, *see* Tr. 933, and issued an unfavorable decision on March 27, 2003. (Tr. 929-40.) The ALJ's decision became the final decision of the Secretary when the Appeals Council denied the plaintiff's request for review on April 21, 2004. (Tr. 920-22.)

The plaintiff now requests judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). Before the Court is the plaintiff's motion for judgment on the administrative record and accompanying memorandum (Docket Entry Nos. 13 and 17), along with the defendant's response (Docket Entry No. 20), and the plaintiff's reply (Docket Entry. No. 21).

## II. BACKGROUND

The plaintiff was born on June 8, 1958, and he was thirty-three years old on September 25, 1991, the date of the alleged onset of disability. (Tr. 31.) The plaintiff attended school through the twelfth grade. (Tr. 90.) From about 1981 to the disability onset date, the plaintiff worked as a tractor trailer mechanic. (Tr. 81, 388, 624.) Prior to that work, the plaintiff worked as a laborer in industrial insulation and rock masonry, a truck mechanic, and a truck stop manager. (Tr. 80, 90.) The plaintiff suffered an on-the-job injury in 1991 while working as a tractor trailer mechanic, and had not worked since that time through the date of his hearing. (Tr. 597, 1087.)

-4-

**A. Chronological Background: Procedural Developments and Medical Records[2]**

Because this case has been twice remanded, the plaintiff's medical history of record dating back to 1991 is at issue. The plaintiff's current medical problems can be traced to an on-the-job injury that occurred on September 24, 1991. (Tr. 146, 168.) The plaintiff's alleged date of onset is fixed at September 25, 1991. (Tr. 31.) The plaintiff was insured under Title II of the Social Security Act through December 31, 1996, and his disability under that title must be established as of or prior to that date.

Following his on-the-job injury the plaintiff had an MRI on October 15, 1991, which revealed a herniated nucleus pulposus in his neck at C5-6, with mild to moderate broad-based subligamentous disc protrusion at C-7. (Tr. 120.) The plaintiff was referred to Dr. Verne Allen, a neurosurgeon. (Tr. 168.) On October 22, 1991, the plaintiff was admitted to the Nashville Memorial Hospital after a myelogram showed defects at both C5-6 and C6-7 on the left. *Id.* Dr. Allen performed a cervical laminotomy on October 23, 1991, during which he found a large free fragment of disc at the C6-7 level and osteophytic spurring at C5-6. *Id.* Following surgery, the plaintiff experienced some weakness but was not in "a lot of pain." (Tr. 169.) However, Dr. Allen reported that the plaintiff had a decreased range of motion, which caused him to need physical therapy. *Id.* The plaintiff developed atrophy

---

[2] Every attempt to decipher the medical evidence of record was undertaken; however, several handwritten sections were simply illegible. General information on the drugs prescribed to the plaintiff was obtained from reputable online resources, unless otherwise indicated.

Case 3:04-cv-00548    Document 28    Filed 11/14/08    Page 5 of 70 PageID #: 15

in his left arm for which Dr. Allen prescribed Naprosyn, a nonsteroidal anti-inflammatory drug. *Id*. In April 1992, the plaintiff had an MRI that revealed a disc rupture at L5-S1, and the plaintiff started physical therapy for this impairment. *Id*.

In July 1992, the plaintiff continued to complain to Dr. Allen of neck and shoulder pain as well as weakness in his triceps, biceps, and deltoid on the left. (Tr. 170.) In September and October 1992, Dr. Allen wrote two letters stating that the plaintiff continued to have weakness in the left arm as a result of the severe root compression that he had before surgery and due to "some permanent impairment." (Tr. 162-63.) In May 1993, Dr. Allen referred the plaintiff to Dr. W.G. Strickland, a neurologist, for an EMG. (Tr. 172, 703.) That study revealed evidence of mild denervation in the left triceps consistent with a left C7 radiculopathy, minimal left median nerve entrapment consistent with carpal tunnel syndrome, and some evidence of mild left ulnar neuropathy. *Id*.

On June 2, 1993, Dr. Allen wrote to the Disability Determination Section ("DDS") that the plaintiff had "significant weakness in the left upper extremity." (Tr. 164.) Dr. Allen opined that the plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds, could sit for six hours in an eight hour day and stand for six hours in an eight hour day but was restricted in utilizing his left upper extremity for heavy labor and from working above his head. *Id*. Dr. Allen based these limitations on the weakness in the plaintiff's left arm and "the impairment of extension in his neck." *Id*. Dr. Allen echoed these restrictions in a

-6-

Medical Assessment Form completed on September 28, 1993, although in this form Dr. Allen stated that the plaintiff had a 30 pound maximum weight restriction as opposed to the previously noted 20 pound limitation. (Tr. 165.) The plaintiff continued to be treated by Dr. Allen throughout 1993 for pain in his neck and arm, suboccipital headaches, weakness in his deltoids and triceps, and a decreased range of motion above his shoulder. (Tr. 702.)

In April 1995, Dr. Allen saw the plaintiff three times at the request of Dr. Strickland. (Tr. 700.) Dr. Allen noted that the plaintiff's low back and radicular left leg pain was "extremely intense." *Id.* On examination, the plaintiff had good reflex and motor function but a "very positive straight leg raising examination and decreased range of motion." *Id.* A myelogram on April 21, 1995, revealed degenerative disc disease at L5-S1; mild right paracentral disc protrusion with associated right paracentral osteophytic spurring at L5-S1 without nerve root compressions; and left lateral and left posterolateral osteophytic spurring with encroachment of the neural foramen. However, definite nerve root compression was not identified. (Tr. 699.) Dr. Allen opined that the plaintiff's condition was "something that would best be treated with therapy right now." (Tr. 700.)

On May 8, 1995, the plaintiff participated in physical therapy with Susan Zimpfer, a physical therapist at Middle Tennessee Medical Center. (Tr. 876-77.) The physical therapist noted that the plaintiff wore a lumbar support with straps over his shoulder, used

-7-

a TENS Unit, walked with a limp, and had a foot drop on the left. *Id.* The plaintiff participated in six sessions of physical therapy over a three week span. (Tr. 878-80.) On May 24, 1995, Ms. Zimpfer completed a physical therapy progress report, in which she reported that the only improvement from therapy thus far was that the plaintiff "may be sleeping better at night." (Tr. 881.) The plaintiff still had frequent "bad days," approximately three times a week, with sharp pain in his left leg and pain with tingling in his right foot. *Id.* On May 25, 1995, Ms. Zimpfer stated that the plaintiff's flexibility and general movement seemed to have improved since the initiation of physical therapy. (Tr. 882.) She also opined that the plaintiff's symptoms "appear[ed] genuine." (Tr. 881.)

On June 6, 1995, the plaintiff returned to Dr. Allen complaining of low back pain. (Tr. 696.) Dr. Allen reported that the plaintiff had good reflex and motor functions in his lower extremities; however, he had some pain with rotatory extension testing. *Id.* Dr. Allen diagnosed cervical radiculopathy. *Id.* Dr. Allen opined that the plaintiff seemed better overall and was going to continue physical therapy. *Id.* The plaintiff saw Dr. Allen again on September 5, 1995, complaining of low back pain and weakness in the left upper extremity. *Id.* Dr. Allen reported that the plaintiff had "mildly positive straight leg raising on examination on the left side." *Id.* Dr. Allen also indicated that the plaintiff was having trouble "from a social point of view" because he was raising two children, could not get a job, and did not have any educational experience so that he could be retrained. *Id.* The

-8-

plaintiff had another myelogram with test results showing foraminal stenosis on the left at L5-S1. *Id.* Dr. Allen opined that surgery would not help the plaintiff. Therefore, he gave the plaintiff a Dosepak and recommended physical therapy and home exercises. *Id.*

On October 6, 1995, the plaintiff was evaluated by Frank Duchesne, a physical therapist with University Medical Center, and Mr. Duchesne reported that the plaintiff had an initial evaluation on September 27, 1995. (Tr. 873.) Mr. Duchesne noted that the plaintiff presented with "somewhat of a Kyphotic posture and a noticeable limp" and that while the plaintiff was able to perform his "Williams flexion exercises" through a further range, he did not respond well to therapy. *Id.* The plaintiff reported to the therapist that although he had good days, his pain generally was "around the clock," and he had not had a good night's sleep in weeks. *Id.*

The plaintiff returned to Dr. Allen on January 16, 1996, with complaints of neck pain and weakness in the left upper extremity. (Tr. 695.) Dr. Allen reported that the plaintiff's TENS Unit was controlling his pain, and he had no "long tract findings or pathologic reflexes." *Id.* On February 20, 1996, Dr. Allen indicated that the plaintiff was experiencing "a lot of" low back pain, and that he had stopped taking his anti-inflammatory medication because it bothered his stomach. *Id.* Again, Dr. Allen recommended physical therapy. *Id.*

On February 28, 1996, the plaintiff had an initial evaluation by the Rehab Group of Lebanon with physical therapist Rebecca Lowe. (Tr. 721.) Ms. Lowe reported that the

plaintiff had decreased weight bearing on the left lower extremity in standing as well as decreased range of motion, strength, and decreased sensation in the left anterior thigh and left lateral lower leg. *Id.* She also stated that the plaintiff had a positive slump test on the left, positive straight leg raise on the left with dorsiflexion, decreased mobility of thoracolumbar spine, and positive posterior to anterior pressure on spinous process T11-S1. (Tr. 722.) After three weeks of physical therapy, Ms. Lowe completed a summary of the plaintiff's progress, noting the plaintiff's increased endurance, decreased pain during muscle testing, and decreased strength in all key muscle groups.[3] *Id.* Ms. Lowe also recommended a work conditioning program for the plaintiff if his goal were to return to work. *Id.*

On July 16, 1996, the plaintiff presented to Dr. Allen with radicular left leg pain that went down his leg into his foot. (Tr. 695.) The plaintiff also continued to complain of neck pain, suboccipital headaches, and residual weakness in his triceps. *Id.* Dr. Allen reported that, on examination, the plaintiff was ataxic (loss in the ability to coordinate muscular movement) and also had positive straight leg raising on the left side. *Id.* Dr. Allen ordered a lumbar spine MRI. (Tr. 726.) The MRI revealed L5-S1 degenerative disc disease with right paracentral disc protrusion superimposed on mild diffuse posterior disc bulge resulting in disc encroachment within the inferior recesses of the neural foramina and mild to

---

[3] The physical therapist indicated that it was "uncertain as to whether the [plaintiff] was giving full effort" in regard to his decreased strength. (Tr. 710.)

moderate L5-S1 foraminal stenosis. *Id.* Dr. Allen gave the plaintiff a Dosepak and recommended home therapy for his disc rupture. (Tr. 695.)

After Dr. Allen's death, the plaintiff's medical records were sent to Dr. Marc Capobianco on October 18, 1996. (Tr. 398, 749.) The plaintiff saw Dr. Capobianco for one evaluation before he was referred to Dr. Jeffrey E. Hazlewood, a specialist in physical medicine and rehabilitation, for his chronic pain. (Tr. 749-52.)

On November 7, 1996, the plaintiff reported to Dr. Hazlewood that physical therapy had not helped his pain, and it had in fact aggravated it. *Id.* Dr. Hazlewood noted that the plaintiff continued to use his TENS Unit as well as a back brace on a regular basis, and he continued to do his home exercises. *Id.* On musculoskeletal examination, Dr. Hazlewood observed that the plaintiff had "an elevated shoulder on the right and he guarded his left upper extremity." *Id.* Dr. Hazlewood further opined that the plaintiff had significantly decreased cervical flexion range of motion, decreased rotation and lateral flexion, decreased flexion and spinal mobility with forward flexion, no extension at all due to pain, tenderness with occasional trigger points on palpation, negative straight leg testing, and his gait was antalgic and slow. *Id.* Dr. Hazlewood reported that there appeared to be decreased muscle bulk in the plaintiff's left arm. *Id.* Dr. Hazlewood also indicated that the plaintiff appeared to have a multifactorial etiology to his pain, with a neuropathic pain

-11-

component (although Dr. Allen's previous evaluation revealed no surgical lesion), a definite biomechanical component due to joint pain, and a myofascial pain component. *Id*.

Dr. Hazlewood recommended the following medication adjustments: increase the plaintiff's Elavil, place the plaintiff on Blacofen for chronic pain management, and in the future place the plaintiff on Lortab on a scheduled basis. *Id*. Dr. Hazlewood also suggested that a trial of joint injections and/or trigger point injections be administered on the plaintiff in the future. *Id*. The plaintiff saw Dr. Hazlewood on five separate occasions from November 21, 1996, to May 23, 1997, reporting back, neck, and joint pain. (Tr. 743-47.) The evaluations during these visits were essentially unchanged from the previous evaluation.

On July 25, 1997, Dr. Hazlewood re-examined the plaintiff in detail and provided a functional evaluation about the effect of the plaintiff's impairments on his ability to function. (Tr. 739-41.) Dr. Hazlewood indicated that the plaintiff could usually do his household chores with frequent rest breaks, that he was able to ride a riding lawnmower, that he could not use his weed eater, and that he could not lift anything heavy. (Tr. 739.) Dr. Hazlewood reported that the plaintiff "show[ed] no significant pain behavior during examination, [and] that there appear[ed] to be some component of symptom magnification, [but] it was of a mild degree." *Id*. While Dr. Hazlewood noted that he believed the plaintiff exaggerated his pain complaints "somewhat," he stated that overall the plaintiff's complaints are "fairly consistent" with the pathology present in the record as well as from

-12-

previous testing. (Tr. 740.) Dr. Hazlewood further opined that based on the consistency of the plaintiff's reports, the plaintiff's pain had a "definite impact on the quality of [the plaintiff's] life a well as his functional activities." *Id*. Dr. Hazlewood indicated that in order to more fully evaluate the plaintiff's ability to do work related activity, he needed a formal functional capacity evaluation. *Id.* However, Dr. Hazlewood opined "in vague terms" that the plaintiff would have difficulty lifting greater than 20 pounds, probably would not be able to stand or walk for a total of more than 2 hours in an eight hour workday, and would probably be able to sit for a total of about six hours in an eight hour workday if he had frequent rest breaks. (Tr. 740-41.) Furthermore, Dr. Hazlewood noted that the plaintiff would not be able to climb, stoop, crouch, kneel, or crawl for extended periods of time and that he had difficulty pushing and pulling. *Id.*

The plaintiff returned to Dr. Hazlewood on October 24, 1997, noting that his pain was essentially the same, and Dr. Hazlewood continued the plaintiff's medication. (Tr. 900.) Dr. Hazlewood also noted that the plaintiff "ambulate[d] with a cane." *Id.* On January 23, 1998, the plaintiff reported to Dr. Hazlewood that he had fallen because his leg "gave out." (Tr. 899.) The plaintiff also indicated that taking Lortab "keeps him functional" and allowed him "to do things around the house that he needs to do." *Id.* The plaintiff returned again to Dr. Hazlewood on April 24, 1998, stating that he was doing "fairly well" overall. (Tr. 898.) The plaintiff indicated that his pain was not bad enough to warrant

-13-

a "SI joint injection," that the increase in Baclofen "definitely help[ed]," and that he did not have any side effects. *Id*. The plaintiff stated that he only had fallen once since his last visit. *Id.*

On June 9, 1998, the plaintiff saw Dr. Willard Mahlon West, a general physician, and presented him with complaints of chest pain. (Tr. 1153.) On June 12, 1998, Dr. West noted that the plaintiff had a decreased range of motion in the lumbar spine area. (Tr. 1152.)

On July 23, 1998, Dr. Hazlewood had "a telephone correspondence" with the plaintiff's attorney regarding the plaintiff's use of his cane. (Tr. 895.) Dr. Hazlewood stated that the plaintiff's use of the cane was "certainly reasonable" given his difficulty maintaining balance. *Id.* The cane assisted the plaintiff in preventing falls and it provided more support to help "unload [his] painful hip." *Id.* Dr. Hazlewood also noted that he thought the plaintiff could do sedentary type work, but he would need rest breaks for him to stretch for approximately one minute or so every thirty minutes, he would need to be allowed to move "around a bit," and he could not do any significant heavy lifting. *Id.* The plaintiff returned to Dr. Hazlewood for another visit on July 28, 1998, with "acute exacerbation of his lower back pain" and weakness in the right lower extremity. (Tr. 894.)

On July 28, 1998, the plaintiff underwent a psychological evaluation to provide information regarding the plaintiff's mental status, psychological adjustment, and what effect, if any, the plaintiff's mental status had on his ability to sustain work related activity.

-14-

(Tr. 889.) The examiners, Thomas Suren, M.A. and Anita Bell, Psy.D., noted that the plaintiff drove himself to the office, walked with the a cane, wore a TENS Unit for pain control, and that his conversation was "punctuated by sighs indicating physical discomfort." *Id.* The examiners administered numerous tests on the plaintiff, including the Minnesota Multiphasic Personality Inventory ("MMPI"), a health problems check list for men, and an incomplete sentences blank adult form. The examiners also performed a clinical interview with a mental status exam as well as a review of all of the plaintiff's records. *Id.* The examiners indicated that the plaintiff took about 50% longer than would normally be required to complete the evaluation, and they believed that his "slow pace was the result of inability to concentrate which was exacerbated by the presence of pain and symptoms of depression." *Id.*

On the mental status examination, the examiners reported that the plaintiff "spoke in a monotone voice and the content of his speech reflected frustration, alienation, and depression." (Tr. 890.) The plaintiff admitted during this examination that he had crying spells, feelings of sadness, anger, and frustration, and that he had previously thought about ending his life before he got custody of his children.[4] *Id.* The examiners noted the plaintiff's tendency to be agitated and symptom focused. *Id.* The plaintiff also frequently thought about being abandoned by his ex-wife. *Id.* On the MMPI, the plaintiff produced valid

--------

[4] The plaintiff reiterated that he no longer had suicidal thoughts because his children were his primary focus in his life. (Tr. 890.)

patterns of response which did not reveal any evidence of a tendency to minimize or exaggerate symptoms. (Tr. 891.) The plaintiff's responses were consistent with "individuals who experience a significant disruption in daily activities due to symptoms of an Affective Disorder." *Id*. The plaintiff's responses to the sentence completion form were "consistent with individuals who experience significant functional impairments due to depression." *Id*. The examiners noted that the plaintiff's responses to the health problems check list "indicated that he was not exaggerating symptoms." [5]

The psychological examiners, after administering the above tests, diagnosed major depression and reported the plaintiff obtained a Global Assessment of Functioning (GAF) score of 45.[6] *Id*. They noted that the tests revealed that the plaintiff answered questions honestly with no tendency to exaggerate or diminish symptoms, that the plaintiff's pattern of responding reflected a realistic and valid concern regarding specific areas of physical health, that the plaintiff did not magnify his symptoms or endorse items that would indicate malingering, and that the examiners believed that valid results were obtained. (Tr. 889.) The examiners assessed the plaintiff as being "markedly limited" in his ability to

---

[5] On the health problems check list the plaintiff indicated problems relating to muscle, joint, and bone pain as well as problems with concentration, attention, memory, fatigue, sleep, social interaction, and appetite disturbances. (Tr. 891.)

[6] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. A GAF of 45 falls within the range of serious symptoms or serious impairment in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders 34 (American Psychiatric Ass'n et al. eds., 4th ed. 2000).

-16-

maintain attention and concentration for extended periods. (Tr. 982.) They further noted that the plaintiff had substantial difficulty sustaining an ordinary work routine and performing work within a regular schedule. *Id.* The examiners opined that the plaintiff was unlikely to complete a normal work day without significant interruption from symptoms of Major Depression. *Id.* The examiners assessed the plaintiff as being "markedly impaired" in his ability to interact with the public as well as his ability to get along with co-workers and peers. *Id.* The plaintiff was "moderately impaired" regarding his ability to respond appropriately to changes in the work setting and how to adapt to new and unfamiliar circumstances. *Id.*

On November 29, 1998, the plaintiff underwent another psychological examination by Alan Yarbrough, Ed. D., at the request of the DDS. (Tr. 901.) Dr. Yarbrough noted that the plaintiff drove himself to the evaluation, used a cane, only used his right hand during the testing session,[7] and gave good efforts on the tasks presented. *Id.* When asked about his daily activities, the plaintiff indicated that he drove himself, did his own shopping with the occasional help from his sister, and did the necessary food preparations for himself and his children. *Id.* Dr. Yarbrough administered the Wechsler Adult Intelligence Scale-revised ("WAISR") on the plaintiff in order to determine his cognitive abilities. (Tr. 903.)

---

[7] The examiner noted that while the plaintiff only used his right hand, this "did not seem to impair his performance." (Tr. 901.)

Dr. Yarbrough reported that the plaintiff's results on the WAISR indicated that he was "currently functioning within the average range of intelligence. (Tr. 904.)

Dr. Yarbrough continued his evaluation of the plaintiff by administering the Millon Clinical Multiaxle Inventory to screen for pathology. *Id*. Scores on three of the plaintiff's personality scales were clinically elevated: schizoid, avoidant, and passive-aggressive. *Id*. The plaintiff also had clinical elevations on three of the clinical scales: anxiety, somatoform, and dysthymia. *Id*. This suggested that the plaintiff was experiencing a significant degree of anxiety and had concerns regarding his physical problems. *Id*. Dr. Yarbrough noted that the plaintiff was only one point short of a clinically significant score on the psychotic depression scale, which suggested that the plaintiff's degree of depression was "likely approaching that of major depression." *Id*.

Dr. Yarbrough opined that the plaintiff had no impairment in his ability to understand, and no impairment was noted in the long- or short-term memory during the clinical interview. *Id*. However, Dr. Yarbrough did find a mild impairment in the plaintiff's short-term auditory memory. *Id*. No impairment was noted in regards to the plaintiff's ability to interact in a socially appropriate manner, his ability to travel unaccompanied in unfamiliar places, or his ability to set realistic goals or make plans independent of others. *Id*. Dr. Yarbrough's diagnostic impression was of dysthymic disorder, anxiety disorder (not otherwise specified), "[r]ule out major depressive episode, single episode in partial

-18-

remission," and a personality disorder with schizoid, avoidant, and passive aggressive traits, and Dr. Yarbrough assigned a GAF of 55.[8] (Tr. 905.)

The plaintiff returned to see Dr. Hazlewood on March 4, 1999, stating that "overall" he was "about the same" as he was on his last visit in July 1998. (Tr. 1112.) The plaintiff denied any side effects from the pain medication, and felt that the medication was "maintaining his quality of life." *Id*. The plaintiff returned to Dr. Hazlewood on June 4, 1999, complaining of "significant pain radiating down [his] left leg to the knee primarily, but occasionally all the way to [his] toes." (Tr. 1111.) The plaintiff also indicated that he felt weaker in his left arm and that he was still using his TENS Unit, but his pain worsened with activity. *Id*.

Following the physical exam, Dr. Hazlewood reported that the plaintiff's strength in the left upper extremity appeared weaker than before, he was unable to abduct fully to 90 degrees, his straight leg raise was negative from a sitting position, and he had some myofascial tenderness in the cervical and lumbar region. *Id*. In light of these findings, Dr. Hazlewood proceeded with an MRI. *Id*. On November 5, 1999, Dr Hazlewood stated that the plaintiff's lumbar spine MRI scan revealed degenerative disc disease at L3-4 and L5-S1, but no significant herniation or stenosis. (Tr. 1110.) The cervical spin MRI scan showed degenerative disc disease at C5-6 and C6-7 with posterior osteophytes; however,

---

[8]A GAF of 55 falls within the range of moderate symptoms or moderate impairment in social, occupational, or school functioning.

no focal disc herniation was seen. *Id*. Dr. Hazlewood offered to refer the plaintiff to a surgeon, but the plaintiff did not want to have surgery at that time. *Id.*

The plaintiff continued to complain of pain and on February 4, 2000, Dr. Hazlewood ordered a myelogram. (Tr. 1109.) On May 6, 2000,[9] Dr. Hazlewood reported that the myelogram results showed no evidence of disc herniation, but did show degenerative disc changes. (Tr. 1108.) The results revealed some spondylosis with moderate neural foraminal encroachment on the left, and mild to moderate on the right at L5-S1. *Id.* Dr. Hazlewood recommended that the plaintiff consult a surgeon. *Id.*

The plaintiff returned to Dr. Hazlewood on June 2, 2000, after seeing Dr. Singer, a surgeon, and being told that there was nothing from a neurological standpoint that needed to be done. (Tr. 1107.) An EMG report of the bilateral lower extremities read as normal. *Id*. Dr. Hazlewood noted that the Oxycontin helped the plaintiff's pain, but it kept him awake at night. *Id*. On December 8, 2000, Dr. Hazlewood administered an "extensive" examination on the plaintiff because he complained of a severe increase in his pain. (Tr. 1103-04.) Dr. Hazlewood reported that the plaintiff had a decreased range of motion, was tender in the upper and lower lumbar region, and had negative straight leg raising. *Id.* The plaintiff could get up and down from the examination table, could walk across the room, and with hand held assistance for balance could go up and down on his toes ten times bilaterally.

_____

[9] The plaintiff also complained of side effects from his Lortab medication on May 6, 2000, and Dr. Hazlewood prescribed Oxycontin. (Tr. 1108.)

*Id.* Dr. Hazlewood indicated that the plaintiff walked with a forward flexed posture and bent knee posture "to a small degree." *Id.* Dr. Hazlewood's impression of the plaintiff was that he had severe/exacerbation of his low back pain without referral into his lower extremities but had good strength throughout his lower extremities without any focal deficits. *Id.*

The plaintiff was hospitalized in December 2001, with complaints of chest pain and was diagnosed with gastritis/duodenitis, chest pain, tobacco use disorder, and pure hypercholesterolemia. (Tr. 1174.) The plaintiff returned to Dr. West for three visits in January 2001. (Tr. 1151.) On January 18, 2001, Dr. West recommended that the plaintiff have an imagining of the spine. (Tr. 1150.) The lumbar imagining report stated:

> The vertebral body heights were well maintained. There was L5-S1 disc space narrowing with the vacuum phenomenon noted. Diffuse anterolateral osteophytes were seen. These were most pronounced at L3-4. Posterior osteophytes were seen at L5-S1 along with facet hypertrophy.

(Tr. 1162.) The impression was degenerative changes most severe at L5-S1. *Id.*

On May 1, 2001, the plaintiff returned to Dr. Hazlewood stating that he was doing much better since the last time, and he was "essentially back to baseline." (Tr. 1101.) The plaintiff explained to Dr. Hazlewood that he had "rigged up some sort of home [arm] brace that seem[ed] to help him." The plaintiff questioned Dr. Hazlewood about receiving an actual arm brace due to weakness in his triceps. *Id.* On June 27, 2001, Dr. Hazlewood completed a medical source statement of the plaintiff's ability to do work-related activities.

-21-

(Tr. 1095-98.) Dr. Hazlewood opined that the plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds, could stand and/or walk less than 2 hours in an 8-hour workday, and must periodically alternate sitting and standing to relieve pain and discomfort. *Id.* Dr. Hazlewood reported that the plaintiff was also limited in pushing and/or pulling in both the upper and lower extremities,[10] was "occasionally" limited in regard to postural limitations such as climbing, balancing, and kneeling, and was limited in reaching in all directions but unlimited in regard to all other manipulative limitations. *Id.* Dr. Hazlewood based these findings on "pain, possible weakness,[11] and deconditioning," *id.*, and recommended that the plaintiff undergo a functional capacity evaluation to document "any inconsistencies and to separate pain from true functional ability." (Tr. 1098.)

The plaintiff saw Dr. West three times in June 2001. (Tr. 1146-48.) During these visits, he complained of dizziness, rib pain, abdominal pain, headaches, a blood blister on his toe and heel, unstable gait, sinusitis, and hematuria (the presence of blood in the urine). *Id*. On July 30, 2001, Dr. West completed a medical assessment of the plaintiff's work-related activities. (Tr. 1171-1171A.) Dr. West opined that the plaintiff could lift a maximum of 10 pounds, stand less than 2 hours in an 8-hour workday and sit about 6 hours. *Id.* These

---

[10] Dr. Hazlewood noted to the side that the plaintiff was limited in pushing and/or pulling to less than 20 pounds occasionally and 10 pounds frequently. (Tr. 1096.)

[11] The ALJ, in his decision, specifically took note of the fact that Dr. Hazlewood based his findings on "*possible* weakness." (Tr. 934.)

-22-

limitations were based on the degenerative changes in the lower lumbar spine and his "chronicity of pain" related to those changes. *Id.* Dr. West noted that the plaintiff had abnormal gait and problems with balance. *Id.*

On July 9, 2001, Dr. David Gaw, an orthopedic surgeon, examined the plaintiff at the request of the DDS. (Tr. 1127-29.) Dr. Gaw noted that the plaintiff was wearing a brace, had significant loss of movement in his neck, and had a lot of soreness and tenderness "all around the neck area with some spasm noted." (Tr. 1128.) Dr. Gaw further indicated that the plaintiff had atrophy of the triceps and biceps on the left, significant weakness of both triceps, and moderate weakness of the biceps. *Id.* The plaintiff also had numbness involving the second and third digits on the left hand. *Id.* Dr. Gaw reported limited range of motion in his back and that he experienced pain when he raised his legs at 75 degrees. *Id.* Dr. Gaw also noted that the plaintiff had no muscle spasms, weakness, or atrophy in his back. *Id.* Dr. Gaw's diagnosis was chronic pain syndrome with post operative cervical spine surgery from his 1991 operation and weakness of the proximal arm and shoulder girdle muscle groups. *Id.*

Dr. Gaw based the plaintiff's functional capacity on the plaintiff's pain, the fact that he was taking two narcotics and using a TENS Unit, and evidence that the plaintiff had nerve damage involving the left upper extremity. (Tr. 1129.) Dr. Gaw was of the opinion that the plaintiff was "significantly incapacitated" and could lift less than 20 pounds

-23-

occasionally and 10 pounds frequently, could stand or walk two hours in an eight hour work day, could alternate periods of sitting in between, and could sit up to six hours in an eight hour work day alternating his positions. *Id.* Dr. Gaw further opined that the plaintiff was incapable of performing any type of gainful activity. *Id.*

On October 2, 2001, Dr. Gaw responded to a letter from the plaintiff's attorney explaining that the plaintiff's narcotic medication was for severe pain and the usual side effects were drowsiness, incoordination, and decreased cognitive activity. (Tr. 1172.). Dr. Gaw opined that the plaintiff "would have difficulty with any sustainable or repetitive type activities with the left upper extremity with the arm in any position but especially with the arm in an outstretched or overhead position for pushing, pulling, lifting, etc." *Id.* Dr. Gaw stated that "pain [was] the limiting factor on what [the plaintiff] [could] do but his history and the clinical findings [were] all consistent with his level of pain." *Id.*

The plaintiff returned to Dr. Hazlewood on January 15, 2002, for a routine follow-up visit. (Tr. 1207.) Dr. Hazlewood reported that the plaintiff had an esophageal dilatation since the last time he had seen him. *Id.* The plaintiff reported his pain as a 6 out of 10 (10 being the worst). *Id.* The plaintiff continued to use his brace and TENS Unit, and he denied any side effects from his medications, which consisted of Oxycontin, Baclofen, and Elavil. *Id.* Dr. Hazlewood administered a physical examination revealing 5/5 strength on the right

but generalized weakness on the left.[12] *Id.* He also reported that the plaintiff had good range of motion throughout and no joint laxity.

On April 9, 2002, Dr. West completed a Medical Source Statement at the request of the SSA Office of Hearings and Appeals. (Tr. 1192-96.) Dr. West opined that the plaintiff could lift a maximum of ten pounds and stand and/or walk less than 2 hours out of an 8-hour day. (Tr. 1193.) Dr. West further indicated that the plaintiff could sit less than 6 hours in an 8-hour day and was limited in pushing and/or pulling in the upper and lower extremities. (Tr. 1194.) These limitations were based on the plaintiff's chronic pain related to degenerative changes in the lower lumbar spine at L5-S1. *Id.* Dr. West also opined that the plaintiff was limited in all manipulative functions, such as reaching in all directions. (Tr. 1195.) These limitations were based on the plaintiff's limited range of motion in his left arm and his numbness in his fingers. *Id.* The plaintiff had no visual/communicative limitations, such as seeing and hearing. *Id.* Dr. West noted that the plaintiff had environmental limitations related to hazards such as heights because he had an abnormal gait due to his chronic pain in the lumbar spine which could affect his balance. (Tr. 1196.)

On April 9, 2002, the plaintiff again saw Dr. Hazlewood and said he was "doing about the same." (Tr. 1206.) Dr. Hazlewood indicated that the plaintiff's medications "really help[ed]" him when he took them. *Id.* The plaintiff reported that he had fallen the

---

[12] Dr. Hazlewood indicated that the plaintiff gave "questionable effort" during the examination. (Tr. 1207.)

-25-

week before and landed on his back, but that his pain had returned to its baseline level. *Id.* Dr. Hazlewood noted that the plaintiff wore a brace, had tenderness on palpation over the left axillary region, that he ambulated with a cane, and that no joint range of motion or joint laxity was seen. *Id.* The plaintiff had "[g]ive away" weakness in his left upper extremity, but otherwise had good strength throughout. *Id.* The plaintiff reported that at worst his pain was a 6/10 and at times a 4/10. *Id.* The diagnostic impression was chronic low back pain/cervical pain with a spondylosis/myofascial pain component, and that the plaintiff was stable on his current medication regimen. *Id.*

**B. January 25, 1995 Hearing Testimony: the Plaintiff's Sister, the Plaintiff's Former Employee, the Plaintiff's Brother**

On January 25, 1995, the plaintiff had a hearing before ALJ Robert C. Haynes at which the plaintiff was represented by counsel (Tr. 250-308.)

The plaintiff's sister, Sheila Gibbs, testified that she lived between ten and fifteen minutes away from the plaintiff and saw him three or four times a week. (Tr. 266.) Ms. Gibbs reported that the plaintiff wore a homemade brace for his arm and that he "fell in the yard and broke it [the brace]." (Tr. 267.) She testified that the plaintiff suffered from "pains in his head" and that he walked with a limp that became more pronounced over time. (Tr. 268, 274.) Ms. Gibbs said that when she visited the plaintiff he was usually "leaned back in his recliner" and "every once in a while he is up." (Tr. 269.) Ms. Gibbs

explained that the plaintiff had good days and bad days, and that on the bad days she goes to the grocery store for him. (Tr. 270.) She testified that the plaintiff seldom drove and that he no longer rode his motorcycle, cut wood, or mowed his yard. (Tr. 272.)[13]

Ms. Gibbs testified that she helped the plaintiff take care of his children. She also believed that the plaintiff was not able to find a job because he was not able to stand or walk "very long" and "whenever he uses his arms or he turns his head a certain way and he looks down, he'll hit the ground every time." (Tr. 273.) Ms. Gibbs further explained that the plaintiff had no use of his left arm and that he typically "hooked it in his belt loop and it just hangs there." *Id.*

The plaintiff's friend, Mr. John Martin, testified that he had known the plaintiff for eight years and that he saw the plaintiff "every other day . . . to help him do a lot of stuff around his house." (Tr. 275.) Mr. Martin explained that he mowed the plaintiff's yard, cut wood for the plaintiff, "take off" the plaintiff's trash, and that his wife would come over to help the plaintiff care for his children. *Id.* Mr. Martin testified that he had been employed by the plaintiff and that before the plaintiff was hurt in September 1991, the plaintiff worked from "daylight to dark." (Tr. 277.) Mr. Martin also witnessed the plaintiff not being able to get out of bed and "had to get my wife to go over there and get his kids to keep

---

[13] Ms. Gibbs explained that the plaintiff's friends come to his home and mow his yard for him. (Tr. 272.)

-27-

'em." (Tr. 278.) Mr. Martin further testified that the plaintiff's neck was stiff all the the time and that the plaintiff was always limping. *Id.*

The plaintiff's brother, Mr. James Tipton, testified that the difference in the plaintiff's activity level before and after September 1991 was similar to "the difference between a young puppy and a very old dog - one's just very active, just constantly on the go. The other one's just totally the opposite." (Tr. 282.) Mr. Tipton said that the plaintiff takes care of his children and does household chores, but that he spends about "half the time . . . laying around." (Tr. 283.)

### C. August 17, 1998 Hearing Testimony: the the Plaintiff's Sister, the Plaintiff's Friend, the Plaintiff's Former Employee

On August 17, 1998, the plaintiff had a hearing before ALJ John P. Garner, at which the plaintiff was represented by counsel. (Tr. 383-476.) Ms. Gibbs, the plaintiff's sister, and Mr. Tommy Jones, the plaintiff's friend, also testified. (Tr. 427-52.) In addition, Mr. John Martin, a former employee of the plaintiff, testified. (Tr. 453-57.)

Ms. Gibbs testified that she would find the plaintiff "mostly in the recliner or on the couch." (Tr. 429.) She explained that the plaintiff's children had to ride the bus to and from school because there were "mornings that he [plaintiff] can't get out of bed." (Tr. 432.) Ms. Gibbs said the plaintiff could only sit in a "straight up position" for a few minutes and that in order to stand "straight up" the plaintiff had to lean on something for support. *Id.*

-28-

Ms. Gibbs testified that she had seen the plaintiff fall several times while walking in his yard and that he repeatedly complained of pain. (Tr.436-38.)

Mr. Jones  testified that the plaintiff moved around "like somebody that's 80 years old or so," and that he had difficult sitting up straight. (Tr. 446-47.) Mr. Jones also stated that the plaintiff used a cane when walking and that he saw the plaintiff fall three times that year. (Tr. 448.)

Mr. Martin testified that the plaintiff was not able to "get up and walk around" as much as he had in the past. (Tr. 454.) Mr. Martin said that the plaintiff was not able to sit or stand for long periods of time, was always in pain, and has good and bad days. (Tr. 454-56.) Mr. Martin described the plaintiff as "hurting so bad[ly]" that "he just wanted to die." (Tr. 456.) Mr. Martin also reported that the plaintiff  had spasms and would fall down. (Tr. 456.)

### D. June 20, 2002 Hearing Testimony: the Plaintiff, the Plaintiff's Father, and a Vocational Expert

On June 20, 2002, the plaintiff had a hearing before ALJ John P. Garner. (Tr. 1208-78.) The plaintiff was present and represented by an attorney. *Id*. The plaintiff's father and Dr. Gordon Doss, a vocational expert ("VE"), were also present. *Id*.

The plaintiff testified that during the last four years his strength and muscle tone had decreased. (Tr. 1215.) He reported that he was more depressed but did not seek

treatment for depression because he did not "think [he] needed any." (Tr. 1215-16.)
Furthermore, he related that his pain had increased, he had more muscle spasms, and he
had developed brief pains in his head that incapacitated him. *Id.* The plaintiff reported that
his children were getting older so they did most of the chores[14] around the house because
he could not do them anymore due to his back and neck pain as well as stomach problems
from the side effects of his medication. (Tr. 1216-17.) The plaintiff testified that if he did any
chores, he would get severe muscle spasms in his back and neck, have pain down his arm,
and would have to use his TENS Unit to help his muscles relax. (Tr. 1217-18.) The plaintiff
said that he lies down two or three times a day, and cannot sit or stand in one position for
a long period of time. (Tr. 1219.) Additionally, the plaintiff stated that he could only sit
without changing positions for 30 to 45 minutes. *Id.* The plaintiff testified that he could only
stand or walk for about 30 to 45 minutes, on a good day. (Tr. 1222.)

The plaintiff reported that he had to either use his cane or push off of a chair with
his right arm to help him stand up. (Tr. 1219.) The plaintiff also stated that he used his cane
to help him walk and keep his balance. *Id.* He said that "dizzy spells" made him lose his
balance. *Id.* The plaintiff testified that he falls about three to four times a week, and that he

---

[14] The plaintiff indicated that he did not vacuum, take the trash out, do the laundry, or mow the yard because it caused him to strain his back and neck which resulted in neck and back pain and spasms. (Tr. 1217-18.)

-30-

had "cracked the top of his head" and fallen on his face "a couple of times." [15] (Tr. 1221.) The plaintiff reported that he mainly had dizzy spells in the morning after taking medication. *Id.*

The plaintiff testified that he had lost all muscle in his left arm, and that his fingers in his left arm were numb. (Tr. 1223.) The plaintiff indicated that he was a smoker, and had burnt his fingers because he had no feeling in his left hand.[16] *Id.* The plaintiff next testified that he used his brace, which he had owned for a couple of years, to help his left arm. *Id.* He stated that he wore it about every other day when he cooked, washed dishes, or drove. (Tr. 1225-26.) The plaintiff reported that Dr. Hazlewood gave him the brace, and it was specially made to fit his arm. *Id.* The plaintiff stated that the brace "[gave] him some limited functions" in his shoulder muscles. (Tr. 1228.)

The plaintiff explained that since he was a single parent with two children, he had to cook everyday. [17] (Tr. 1221.) He related that he did not drive as often as he used to and relied on his father and sister to shop for him, but he occasionally drove to the store or

---

[15] Upon questioning from the ALJ, the plaintiff acknowledged that he had never gone to the emergency room for his injuries from falling, and that he had never "busted his head open" or needed stitches. (Tr. 1222.)

[16] Upon questioning from the ALJ, the plaintiff explained that while he was right-handed, he smoked with his left hand out of habit. (Tr. 1224.)

[17] During the hearing, the plaintiff stated that he had two children. (Tr. 1128.) However, on an evaluation report, Dr. Gaw wrote that the plaintiff "state[d] he ha[d] four children." (Tr. 1127.)

-31-

drugstore. *Id.* The plaintiff stated that his children were 11 and 12 years old and that they helped him "quite a bit." (Tr. 1229.) He testified that he no longer drove his children to school because it was not safe to drive where he lived since cars drove too fast. *Id.* The plaintiff stated that he had trouble turning his head due to pain, which caused him problems turning the steering wheel and looking out of the car's windows. (Tr. 1230-31.) The plaintiff testified that if he looked up, he got dizzy. (Tr. 1232.)

The plaintiff testified that his right arm was stronger than his left and that he could lift around 40 to 50 fifty pounds. (Tr. 1233.) However, the plaintiff stated that when he does "a lot" with his right arm, he has pain and spasms in his neck. *Id.* The plaintiff testified that he could not even manage to do small tasks with his left arm. *Id.* He stated that if he tried to hold even a saucer or cup he would drop it because he has no strength in that arm. (Tr. 1234.) The plaintiff testified that he tried hard to "work his arm" in order to not lose his muscle, but his efforts were to no avail, and his arm strength never improved. *Id.*

The plaintiff testified that he uses a TENS Unit, takes hot showers, and uses an Arctic Heat analgesic rub and a heating pad. (Tr. 1234-35.) The plaintiff stated that he takes Oxycontin, Aleve, Baclofen, and Vioxx, prescribed by Dr. West. (Tr. 1235-36.) The plaintiff stated that he could not take the Oxycontin before bed because it prohibits him from sleeping, the Baclofen does not always help, and the Vioxx helps "a little bit." (Tr. 1236.) The plaintiff testified that he thought the medication was what caused his esophagus to

-32-

collapse, and that the medication also made him drowsy. (Tr. 1237-38.) The plaintiff also testified that he sometimes took Oxycodone.[18] *Id.* He stated that Dr. Hazlewood quit prescribing it, but he still had some pills left. *Id.* The plaintiff stated that overall the medication made his pain "tolerable." (Tr. 1241.) The plaintiff testified that Dr. Hazlewood treated his back and his neck, the "Workers Comp doctor" treated his arm, Dr. West was his regular family physician, and Dr. Allen treated him for his ruptured disc and his neck. (Tr. 1243.)

The plaintiff's father, Mayford Tipton, Sr., testified that he lived only 200 feet from his son and was with him about 90 percent of the day. (Tr. 1244.) Mr. Tipton reported that he had to help his son with chores around the house. *Id.* He stated that his son had severe muscle spasms. (Tr. 1244-45.) Mr. Tipton testified that the plaintiff would sometimes mow the yard "around a rock or two" to help his son, but otherwise he just "sits around and drinks coffee." (Tr. 1245-46.) Mr. Tipton also stated that if the plaintiff tried to mow the yard, he would be "down for two or three days" because of his pain. (Tr. 1247.)

Mr. Tipton explained that he was trying to help the plaintiff "survive." (Tr. 1250.) He reported that his son's only source of income was $140.00 a month from Families First. *Id.* Mr. Tipton testified that his son sometimes had dizzy spells which caused him to "walk

---

[18] The ALJ questioned the plaintiff about whether he actually had been prescribed Oxycodone. The plaintiff retrieved a bottle from his "medicine bag," showing the prescription for Oxycodone. The plaintiff stated that the Oxycodone made him itch, so he only took if his pain got really bad. (Tr. 1239-41.)

-33-

backwards," "bump into stuff," and sometimes someone had to "catch him." *Id.* Mr. Tipton

stated that he saw his son fall three or four times within the last six months, and he had to

help him get up and that his son used his cane every day. (Tr. 1251-52.) He stated that his

son could lift a gallon of milk with his right arm but could not lift anything with his left

arm. *Id.* He also testified that his son has headaches that "puts (sic) him on his knees, or on

his face." (Tr. 1253.) Mr. Tipton stated that the headaches occur about three or four times

per week. *Id.*

Mr. Tipton related that his son seemed depressed "a lot." *Id.* Mr. Tipton said he

believed his son's depression was caused by his son's severe pain and the fact that he and

his doctors could not find anything to alleviate his pain. *Id.* Mr. Tipton testified that his son

had no hope. (Tr. 1254.) He stated that before his son's injury in 1991, his son was a

"workaholic" and would work about 16 to 18 hours a day, seven days a week. *Id.*

The ALJ called the VE to testify about the plaintiff's past work. (Tr. 1255). The VE

stated that the plaintiff's work as a trailer mechanic was considered heavy, semi-skilled

work and that the plaintiff had no transferable skills. *Id.* The ALJ questioned the VE about

the recommended limitations in Dr. West's medical source statement completed on April 9,

2002. Dr. West's limitations included lifting a maximum of ten pounds, standing and/or

walking less than two hours out of an eight hour day, sitting less than six hours in an eight

hour day, limited in pushing and/or pulling in the upper and lower extremities, and

-34-

limited in regard to heights due to his unstable gait. (Tr. 1193-96,1256.) The VE testified that those restrictions would not allow any work. (Tr. 1256.)

Next, the ALJ questioned the VE regarding Dr. West's medical source assessment completed on July 30, 2001. In this medical source assessment, Dr. West limited the plaintiff to lifting less than ten pounds occasionally, ten pounds frequently, limiting standing and walking to less than two hours, and limiting sitting for five or six hours in an eight-hour work day. (Tr. 1171-1171A.) The medical source assessment did not restrict the plaintiff in reaching, handling, fingering, pushing, pulling, seeing, hearing, speaking, or normal postural activities; but it slightly restricted working in heights. *Id.* The VE testified that these limitations would allow less than full time work. *Id.*

The ALJ asked the VE about another unsigned statement apparently authored by Dr. West on July 31, 2001.[19] (Tr. 1138-41, 1256) This medical source statement limited the plaintiff to occasionally and frequently lifting ten pounds, standing and/or walking less than two hours, sitting about six hours, not limited in the upper extremities, limited in the lower extremities, and not limited at all in postural limitations, such as climbing and

---

[19] Although it is not signed, the handwriting on the July 31, 2001, medical source statement appears to match the handwriting on the July 30, 2001, statement.

balancing. *Id.*[20] The ALJ noted that there was another medical source assessment that indicated it was completed by Dr. West on June 27, 2001, but was signed by Steve Leonard, a family nurse practitioner. (Tr. 1131-36, 1257.) The ALJ stated that this assessment "[went] to the weight" since under the Social Security Rules, statements from family nurse practitioners are not normally considered approved sources. (Tr. 1257.)[21]

The ALJ shifted his focus to a medical source statement completed by Dr. Gaw on July 9, 2001. (Tr. 1257.) Dr. Gaw's statement indicated that the plaintiff was significantly incapacitated due to nerve damage in the upper left extremity, limiting him to lifting less than twenty pounds occasionally, lifting less than ten pounds frequently, standing or walking two hours in an eight-hour work day alternating sitting in between, and sitting up to six hours in an eight hour day while alternating his positions. (Tr. 1258.) The ALJ stated that Dr. Gaw essentially limited the plaintiff to a range of light, closer to sedentary work,

---

[20] The ALJ questioned the consistency of Dr. West's limitations. In his April 9, 2002, medical source statement, Dr. West limited the plaintiff in both the upper and lower extremities, in the July 30, 2001, statement, Dr. West did not limit the plaintiff at all in the upper or lower extremities, and in the July 31, 2001, statement, Dr. West limited the plaintiff only in the lower extremities. (Tr. 1256-57.)

[21] In regard to the statement signed by Steven Leonard, the attorney corrected this mistake via a letter to Dr. West's office. (Tr. 1130.) The attorney stated that she was sending another blank form to Dr. West for him to fill out. *Id.* However, upon plaintiff's counsel's request (Tr. 1130), it appears that Dr. West completed another medical assessment in lieu of Mr. Leonard's medical assessment. It is not clear whether Dr. West intended his July 30, 2001, or July 31, 2001, statement to be substituted for the June 27, 2001, assessment signed by Mr. Leonard.

Case 3:04-cv-00548   Document 28   Filed 11/14/08   Page 36 of 70 PageID #: 46

and the VE agreed. *Id.* The VE also pointed out that there was a comment made by Dr. Gaw that indicated that the side effects of the plaintiff's medication would prevent successful work. (Tr. 1258.) The ALJ responded saying that he was "going to make a finding on that." *Id.* The ALJ stated that he "[didn't] believe that the information with respect to medications that Dr. Gaw was offering his assessment on [sic] was accurate in terms of what the [plaintiff] was actually using and needing." *Id.*

The ALJ continued questioning the VE, focusing on jobs that would be categorized as "light work." (Tr. 1259.) The VE testified that there were about 6,020 entry level security guard positions available that would allow alternating between sitting and standing, and, with a limitation of lifting only 20 pounds occasionally, 2,283 jobs as a messenger "driving small packages around," which was an unskilled light job, and 1,424 jobs as a meter reader in the State of Tennessee, which is classified as unskilled and light work. *Id.* The VE stated that there were 2,283 of those jobs. *Id.*

The VE testified there were 999 jobs as an entry level order clerk in Tennessee for someone with a high school education and no past job skills who is limited to sedentary work. (Tr. 1260.) The VE also reported that there were 1,032 unskilled, entry level information clerk jobs, which were also classified as sedentary work. *Id.* The VE testified that, at a sedentary level, there were about 628 jobs as a dispatcher of trucks for plumbing, heating, and air-conditioning repair services in Tennessee. *Id.* The VE explained that the

meter reader job would allow the least amount of flexibility, but that all of the other jobs would provide a sit/stand option at will. *Id*.

The ALJ asked the VE to consider that the plaintiff was limited to occasional reaching with the non-dominant upper left extremity, and to explain the impact on the jobs identified. *Id*. The VE stated that such a limitation would not affect the availability of the jobs he had identified. (Tr. 1261.) The ALJ then asked the VE to assume that the plaintiff experienced significant limitation in neck mobility, including flexion, extension, and rotation, and the potential impact on his ability to perform any of the listed jobs. *Id*. The VE testified that those limitations would affect the jobs of messenger and meter reader because it would be difficult to get hired; however, the VE stated that it would not affect any of the other jobs. *Id*. The ALJ next asked the VE to assume that the plaintiff had a fair amount of difficulty with postural activities, particularly in climbing and balancing. *Id*. The ALJ asked the VE whether or not those limitations would have any impact on the light or sedentary jobs. *Id*. The VE responded that it would not, unless the balance difficulty was the type that would affect a person's depth perception and driving. *Id*. The ALJ questioned the VE about the plaintiff's use of his cane. *Id*. The VE testified that the need to use a cane would not affect any of the jobs, in and of itself. *Id*. The VE explained that "the implication of the need for a cane ... could affect a person's hireability, [b]ut from the standpoint of having to carry a cane, it would not affect the ability to perform these jobs." *Id*.

-38-

The ALJ then asked the VE to assume that the plaintiff was very restricted in his ability to use his non-dominant, upper left extremity. (Tr. 1262.) The ALJ asked the VE if this restriction would impact the jobs since the plaintiff "certainly [was] not going to be engaged in any fine fingering or manipulation with the upper left extremity." (Tr. 1262-63.) The VE responded that the order clerk job and the commercial driving job would not be available to a "one-arm person," but the dispatching job and the security job would be available at an unskilled entry level position. *Id.*

The ALJ next questioned the VE regarding Dr. Hazlewood's June 27, 2001, limitations, including lifting 20 pounds occasionally, 10 pounds frequently, standing and walking less than two hours in an eight-hour work day, alternating sitting and standing, pushing and pulling less than 20 pounds occasionally and ten pounds frequently, occasionally limited with postural activities, occasionally limited in reaching, unlimited in handling, fingering, feeling, seeing, hearing, and speaking, and not limited in regard to environmental concerns. (Tr. 1263.) The VE testified that this assessment would be consistent with the light entry level jobs, that there would be no more than 25 percent of the entry level security jobs available, or about 1,500 jobs, and that the only other jobs that would be available would be the sedentary jobs. (Tr. 1264.)

The ALJ then questioned the VE regarding the psychological consultative exam administered by Dr. Yarbrough on November 29, 1998. *Id.* The ALJ noted that

Dr. Yarbrough's opinion assigned no significant impairment in the plaintiff's ability to understand; a mild impairment in short-term auditory impairment; no impairment in concentration or persistence; the ability to interact in a socially appropriate fashion; and no impairment in the ability to travel unaccompanied, set realistic goals, and make plans independently. *Id.* The VE opined that these impairments would rule out any driving jobs because of the moderate limitation in short-term memory, and that the sedentary jobs and the security guard jobs would be reduced by about 50 percent, but the other jobs would remain available. *Id.* The VE also testified that the plaintiff's GAF, and which was estimated at 55, in both the current and past year, and which was described as a moderate impairment in social occupation and school functioning, would not further limit the jobs available to the plaintiff. (Tr. 1265.)

The ALJ shifted focus to the assessment completed by Thomas Suren, M.A. and Anita Bell, Psy.D. on July 28, 1998, which reflected markedly limited in concentration, persistence, and social interaction, substantially limited in pace, and moderately limited in adaption. *Id.* The VE testified that these limitations would not allow any work. *Id.* The VE also testified that if the plaintiff's GAF were 45, as indicated on the assessment, the plaintiff would not be able to work. *Id.*

The ALJ then questioned the VE regarding Dr. Allen's September 28, 1993, assessment, in which he opined that the plaintiff could lift 30 pounds occasionally, ten to

twenty pounds frequently, and could stand, walk, and sit for six hours in an eight-hour day. The VE testified that based on that assessment, the plaintiff would be able to perform a full range of light and sedentary work. (Tr. 1266.) The ALJ asked the VE to assume that the plaintiff had a GAF of 55 and had the limitations that Dr. Allen assigned. *Id*. The VE testified that the number of security jobs would be reduced by half, but the other jobs he previously identified would remain available. *Id*.

The ALJ next asked the VE to assume that the plaintiff could lift 30 pounds maximum, but not work above the head. *Id*. The VE opined that such a restriction would allow more jobs other than ones he previously mentioned. *Id*. The VE testified that the plaintiff would be able to drive a paper route, work as a mail clerk, or work as a teacher's aide. *Id*. The VE stated that there were 2,168 paper route driver jobs, 2, 955 mail clerk jobs, and 1,322 teacher aide jobs in Tennessee. (Tr. 1267.)

The VE also testified that the plaintiff's need to lie down and rest in order to relieve his pain during the day would make it difficult for him to sustain work on an eight-hour day basis. *Id*.

The plaintiff's attorney asked the VE to assume that the plaintiff was as limited as Dr. Gaw's assessment and had a limited grip strength in the non-dominant hand. (Tr. 1267.) The VE replied that the effect on jobs would depend on the degree of limitation and how much a person is able to grasp, but typically most desk jobs or telephone related

-41-

jobs would not significantly be affected if the limited grip strength were in the non-dominant hand. *Id*. Seeking clarification, the plaintiff's attorney asked the VE to assume that the plaintiff's grip was limited to the degree that he could not even hold a coffee cup. (Tr. 1268.) The VE testified that the clerical jobs such as telephone answering jobs and the information clerk jobs would not be affected and essentially could be performed by a person with one arm, but that the driving jobs would be significantly affected. *Id.*

The plaintiff's attorney asked the VE if the plaintiff's unstable balance, causing him to fall several times a week, would affect his employability for certain jobs. (Tr. 1269.) The VE testified that if the plaintiff simply had a loss of balance, the jobs that are performed seated would not be significantly affected. However, if the loss of balance were associated with dizziness, vertigo, or nausea, it could significantly affect employment.[22] *Id.*

Attempting to flesh out the potential impact on sedentary jobs, the plaintiff's attorney focused on the accompanying side effects—nausea and drowsiness—of the plaintiff's taking Oxycontin two times a day, Baclofen five times a day, Aleve as needed,

---

[22] The plaintiff's attorney continued to ask the VE about the plaintiff's dizziness, and his falling regardless of his use of the cane. The ALJ interjected telling the plaintiff's attorney that:

> Honey, you jump from cervical disk disease and lumbar disease to dizziness, and falling two times a week. And I'm total (sic) disability based on dizziness, I mean you are reaching out there into the ozone.

(Tr. 1271-72.)

-42-

and Vioxx once a day.[23] (Tr. 1274.) The VE testified that "the effect of medication has to be measured based on it's (sic) effect on psychological functioning limitation again." *Id.* The VE explained that this effect must be "objectified because people respond in different ways to medication." *Id.*

Finally, the plaintiff's attorney asked the VE to assume that the plaintiff's limitations were that of a one-armed worker who used a cane for balance, had limitations in turning his head as well as mobility of his head, and had the need to get up from a seated position approximately every 30 minutes and move around for a minute or so. (Tr. 1275.) The plaintiff's attorney asked the VE how all of those factors affected the sedentary occupational base. *Id.* The VE stated that the additional information would not change his previous answers. *Id.* The plaintiff's attorney asked for a percentage of how the sedentary occupational base would be affected. (Tr. 1276.) The VE testified that it would reduce "access to the sedentary jobs, [but] by how much a person cannot legitimately say" since that information does not exist. *Id.*

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on March 27, 2003. (Tr. 929-40.) Based on the record, the ALJ made the following findings. (Tr. 939.)

_____

[23] The ALJ told the VE not to answer this question because it was not "proper" as it was a "medical question." (Tr. 1274.)

-43-

1.      The claimant met the disability insured status requirements of the Act on Sept 25, 1991, and continued to meet them through December 31, 1996, but not thereafter.

2.      The claimant has not engaged in substantial activity since the alleged onset date.

3.      The medical evidence establishes that the claimant has "severe" impairments, including degenerative disk disease, with previous surgery and a herniated disk, chronic pain syndrome, dysthymia, an anxiety disorder, N.O.S., and a personality disorder, N.O.S., but does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.      The subjective complaints are not persuasive for the reasons discussed above.

5.      The claimant has the residual functional capacity to perform a limited range of light work with psychological limitations, as described more fully above (20 CFR 404.1545 and 416.945).

6.      The claimant is unable to perform his past relevant work.

7.      The claimant is 44 years old, which is defined as a younger individual (30 CFR 404.1563 and 416.963).

8.      The claimant has a high school education (20 CFR 404.1564 and 416.964.)

9.      The claimant does not have any acquired work skills, which are transferable to the skilled or semiskilled work functions of other work (20 CFR 404.1568 and 416.968.)

10.     Based on an exertional capacity for light work and the claimant's age, education, and work experience, section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16 and Rule 202.21, Table

No. 2, of Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

11.     Although the claimant's additional non-exertional limitations do not allow him/her to perform the full range of light work, using the above-cited rule as a framework for decision-making and based on the vocational expert's testimony, there are a significant number of jobs in the economy that he could perform. Examples and numbers of such jobs are cited above.

12.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).


## IV. DISCUSSION

### A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence

-45-

as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402

U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126

(1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit

opinions adopting language substantially similar to that in *Richardson*). A reviewing court

may not try the case de novo, resolve conflicts in evidence, or decide questions of

credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v.

Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit

findings and determination unless the record as a whole is without substantial evidence

to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health

& Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the

issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

The original burden of establishing disability is on the plaintiff, and impairments must be

demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See*

42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must

show that he is not engaged in "substantial gainful activity" at the time he seeks disability

benefits. *Heston*, 245 F.3d at 534 (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff

who is performing substantial gainful activity is not disabled no matter how severe the

plaintiff's medical condition may be. 20 C.F.R. § 416.920(a)(4)(I).

-46-

Second, the plaintiff must show that he suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Heston*, 245 F.3d at 534 (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Foster*, 853 F.2d at 490 (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not

-47-

required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id*. The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a prima facie case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a prima facie case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner to carry his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other

-48-

work exists in the national economy that the plaintiff can perform, he is not disabled.[24] *Id.*
*See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

## B. The Five Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five-step inquiry, and ultimately concluded that the plaintiff was not under a disability as defined by the Act. (Tr. 939.) At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since the alleged onset of disability. *Id.* At step two, the ALJ found that the plaintiff had severe impairments considered severe based on the requirements in 20 CFR § 416.920(b). *Id.* At step three, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. *Id.* At step four, the ALJ found that the plaintiff was unable to perform

---

[24] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if he or she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

-49-

any of his past relevant work. *Id*. At step five, the ALJ concluded that although the plaintiff's exertional limitations did not allow him to perform the full range of light work, using Medical-Vocational Rule 201.20 as a framework for his decision making, there were a significant number of jobs in the economy that he could perform. *Id*.

The effect of this decision was to preclude the plaintiff from DIB and SSI benefits and to find him not disabled, as defined in the Social Security Act, at any time after December 31, 1996, through the date of the decision.

### C. Plaintiff's Assertion of Error

The plaintiff alleges that the ALJ erred in evaluating his credibility, failed to give any weight to the assessments of treating physician William West, M.D., and that the ALJ erred in finding that the plaintiff was not disabled when treating physicians' assessments show that the plaintiff could not perform a full day of work. (Docket Entry No. 17, at 20.)

### 1. The ALJ erred in evaluating the plaintiff's credibility[21]

The plaintiff argues that the ALJ erred in evaluating the credibility of his subjective complaints of pain. The ALJ concluded that the plaintiff was able to "perform activities of daily living independently" despite his complaints of pain and that the plaintiff's subjective complaints of pain were unpersuasive to the extent the plaintiff alleged. (Tr. 938)

---

[21] Both times that this case was remanded, the Court ordered the ALJ to review and further consider the plaintiff's subjective complaints and allegations of pain and the side effects of his medication. (Tr. 478, 1075.)

-50-

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision as to credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge [his] subjective complaints." *See Buxton v. Halter*, 246 F. 3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F. 3d at 1036). Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s] of the ALJ. 1996 WL 374186 at *4. If a plaintiff's complaints with respect to symptoms are not supported by objective medical evidence, the ALJ must make a determination based on consideration of the record as a whole, including lab findings, the plaintiffs complaints, information provided by treating physicians and other relevant evidence. The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers would know the weight given to the plaintiff's statements and the reason for that weight. *Id.*

Both the Social Security Administration (SSA) and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 404.1529; *Felinsky v. Bowen*, 35 F.3 1027, 1037 (6th Cir. 1994). While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end

-51-

there.  The Sixth Circuit in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847

(6th Cir. 1986), set forth the basic standard for evaluating such claims.[22]  The *Duncan* test

has two prongs.  The first prong is whether there is objective medical evidence of an

underlying medical condition.  *Felisky*, 35 F.3d at 1039.  The second prong has two parts:

(1) whether objective medical evidence confirms the severity of the alleged pain arising

from the condition, or (2) whether the objectively established medical condition is of such

a severity that it can reasonably be expected to produce the alleged disabling pain. *Id.*  This

test does not require objective evidence of the pain itself.  *Duncan*, 801 F. 2d at 853 (quoting

*Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

 There is objective medical evidence of underlying medical conditions: the plaintiff

has been diagnosed with cervical and lumbar degenerative disc disease (resulting in

previous surgery and a herniated disc), chronic pain syndrome, dysthymia, and anxiety.

This objective medical evidence satisfies the first prong of the *Duncan* test.

The second prong of the *Duncan* test consists of two alternatives. Thus the plaintiff

must only meet one of the following two elements: the objective medical evidence

"confirms the severity of the alleged pain arising from the condition" or the "objectively

established medical condition is of such a severity that it can reasonably be expected to

---

[22] Although *Duncan* only applied to determinations made prior to 1987, the Sixth
Circuit has since held that *Duncan* continues to apply to determinations made after 1987.
*See Felisky*, 35 F.3d at 1039 n. 2.

produce the alleged disabling pain." The SSA sets forth a checklist of factors in order to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The SSA will not ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of their pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[23] After evaluating the plaintiff's complaints as "required under applicable regulations and rulings," the ALJ determined that the plaintiff's subjective complaints of pain were not compelling to "the extent alleged." (Tr. 938.) Although the ALJ summarized the findings of the plaintiff's physicians, the ALJ did not properly evaluate the factors found in 20 C.F.R. § 404.1529(c)(3) in determining the plaintiff's credibility.

---

[23] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

-53-

The ALJ included a general discussion in his decision to support his finding that the plaintiff was not credible. Yet an analysis of the factors from 20 C.F.R. § 404.1529(c)(3) below demonstrates that substantial evidence does not exist to support the ALJ's decision.

### (i) Daily Activities

The ALJ stated that "despite complaints of pain, the claimant has generally performed activities of daily living independently." (Tr. 938.) Substantial evidence does not support that conclusion. The plaintiff testified that the pain in his head occurs more frequently than in the past and that physical exertion triggers muscle spasms. (Tr. 1215-1216.) He stated that he is not able to mow his yard, vacuum, take out the trash, or wash laundry because of his neck and back pain. (Tr. 1216-1218.) The plaintiff attempts to alleviate the pain and muscle spasms by using a TENS Unit. (Tr. 1218.) He also testified that he lies down two or three times a day, is only able to stand or walk for about 30 to 45 minutes, and rarely uses his left arm to complete even the smallest of tasks. (Tr. 1223.) Furthermore, the plaintiff drives once or twice a week and usually relies on his father or sister to go "to town" for him. (Tr. 1228.)

The plaintiff depends upon others, including his family, to assist him with the upkeep of his home, driving, and moving around his own home and property. The testimony of the plaintiff and his father paints a much different picture of the plaintiff than that of an individual who lives without daily assistance. The ALJ is required to consider

-54-

evidence provided by lay persons who have intimate knowledge of the plaintiff's "pain or other symptoms." 20 C.F.R. § 404.1529(c)(3). The ALJ briefly discussed the father's testimony, but not in the context of considering the plaintiff's credibility.[24]

The plaintiff's father ("Mr. Tipton") testified that he lived only 200 feet from the plaintiff and was with him about 90 percent of the day.[25] He has had the most consistent and continuous contact with the plaintiff, placing him in a position to fully understand what activities the plaintiff engaged in on a daily basis. Mr. Tipton testified that he and the plaintiff's children do most of the plaintiff's chores around the house, that the plaintiff is confined to his bed for successive days if he attempts to mow his own yard, that the plaintiff is not steady on his feet, and that numerous people stop in to check on the plaintiff. (Tr. 1244, 1246, 1247, 1250-51) Mr. Tipton also provided separate and corroborating testimony of the plaintiff's dependent lifestyle, as had the plaintiff's sister and friends in the previous hearings, which the ALJ did not adequately address.

---

[24] The ALJ did not address the testimony of the plaintiff's sister or his friends who testified at the previous hearings.

[25] In discussing the testimony of Mr. Tipton, the ALJ stated that Mr. Tipton testified that he saw his son for only "90 minutes" a day. (Tr. 936.) However, the transcript of the hearing clearly indicates that Mr. Tipton's testimony was that he spent ninety *percent* of each day with his son. (Tr. 1244.)

**(ii) The location, duration, frequency, and intensity of pain**

Th ALJ devoted the final paragraph of his decision to an analysis of the plaintiff's subjective complaints of pain. He mentioned that Dr. Hazlewood reported symptom magnification, questioned the actual weakness in the plaintiff's upper extremities, and noted "give away" weakness on examination. (Tr. 938.) Standing alone, these statements are true. Yet, the ALJ removed the statements from the appropriate context and failed to fully analyze the plaintiff's reports of the intensity and frequency of his pain.

The ALJ failed to mention that Dr. Hazlewood also stated that the plaintiff's "reports of his pain [were] fairly consistent with the impairments he [seemed] to have." (Tr. 740.) Furthermore, Dr. Hazlewood noted that while the plaintiff did exaggerate his pain "somewhat," the plaintiff's pain was "fairly consistent with the pathology present from previous testing and based on the records [he] [had]." *Id.* When Dr. Gaw examined the plaintiff on July 9, 2001, he reported that "the clinical findings [were] all consistent with [the plaintiff's] level of pain." (Tr. 1172.) In his letter of October 2, 2001, Dr. Gaw noted that the plaintiff was taking medication for "severe pain." *Id.* Furthermore, Susan Zimpfer, one of the plaintiff's physical therapists, reported that the plaintiff's symptoms "appear[ed] genuine." (Tr. 881.)

The ALJ credited one statement, taken out of context, proffered by Dr. Hazlewood in order to discount the plaintiff's complaints of pain and he failed to discuss fully the

intensity and extensive duration of the plaintiff's pain. The plaintiff consistently complained to nearly every doctor who examined him since his injury in 1991 of muscle spasms, weakness in his left arm, numbness in his fingers, and neck and back pain.

### (iii) Precipitating and aggravating factors:

The ALJ did not discuss this factor in discrediting the plaintiff's credibility. At the hearing, the plaintiff testified that the pain in his back was always there and was exacerbated by activity. (Tr. 1242.) Dr. Hazlewood noted the consistency of the plaintiff's reports of pain. (Tr. 740.) The plaintiff testified that if he did any chores, he would get severe muscle spasm in his back and neck, pain down his arm, and he would have to use a TENS Unit. (Tr. 1217-18.) The plaintiff also fell on several occasions due to dizziness. (Tr. 1206.) Likewise, the plaintiff reported to Dr. Hazlewood that physical therapy had not helped his pain, but instead had aggravated it. (Tr. 749-52.)

The defendant argues that "the regulations do not require that the ALJ discuss every credibility factor in his decision," citing *Stevenson v. Apfel*, 202 F.3d 275 (Table), 1999 WL 970261, *2 (7th Cir. Oct. 20, 1999), an unpublished case from the Seventh Circuit, as the supporting authority. (Docket Entry No. 20, at 10.) Since the case is from the Seventh Circuit, it is not binding authority upon this Court. Furthermore, the Sixth Circuit requires ALJ's to apply the "full test" set out in 20 C.F.R. § 404.1529(c) for evaluating subjective complaints of pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1040-41. (6th Cir. 1994.)

-57-

**(iv) The type, dosage, effectiveness, and side effects of any medication**

The ALJ found that the plaintiff affirmatively reported, on numerous occasions, no side effects from the narcotic and other medications prescribed by Dr. Hazlewood. (Tr. 938.) Although the plaintiff occasionally stated there were no side effects, there are examples of side effects from his prescribed medication in the record. In 1996, the plaintiff had to stop taking his anti-inflammatory medication because it bothered his stomach. (Tr. 696.) In 2000, the plaintiff complained to Dr. Hazlewood of side effects to his Lortab medication; therefore, Dr. Hazlewood stopped prescribing Lortab, and instead prescribed Oxycontin. (Tr. 1108.) Dr. Gaw explained that the usual side effects of the narcotic pain medication that the plaintiff was taking were drowsiness, incoordination, and decreased cognitive activity. (Tr. 1172.)

It could be inferred from Dr. Hazlewood's report that the plaintiff's medication "really help[ed] him when he took them" (Tr. 19), but that the plaintiff did not always take his medication. If the plaintiff did not always take his medication, even when they helped relieve his pain, it might well have been because of the side effects he complained about to his doctors and testified about in the hearing. The plaintiff testified that he had stomach problems from his medicine, dizzy spells in the morning after taking his medicine, and he could not sleep at night when he took Oxycontin. (Tr. 1217, 1221, 1236.) The plaintiff also

-58-

stated that he thought the medication is what caused his esophagus to collapse. (Tr. 1237.)[26] There is no substantial evidence in the record to support a conclusion that the plaintiff did not have side effects from his medication.

### (v) Treatment, other than medication, used to relieve pain

The ALJ briefly addressed the additional treatment and physical therapy the plaintiff received to alleviate his pain. He related that "[t]he claimant reported using a cane because of dizziness, and Dr. Hazlewood recommended its use only at the request of the claimant's attorney in 1998. Regardless if it is really necessary, the vocational expert identified that jobs would allow its use." (Tr. 938.) The ALJ's decision did not mention Dr. Hazlewood's statement that the plaintiff's use of the cane was "certainly reasonable" given the plaintiff's trouble balancing. (Tr. 895.) Additionally, Dr. Hazlewood said that the cane would help the plaintiff prevent falls and it would provide more support to help him "unload the painful hip." *Id*. The ALJ briefly mentioned the plaintiff's use of a TENS Unit and an arm brace, and that he had attended physical therapy on more than one occasion. (Tr. 934-935.) Yet, the ALJ did not discuss these treatments in the context of consideration of the plaintiff's credibility.

---

[26] The ALJ noted in his decision that evidence of the plaintiff's esophagus collapsing was not documented in the medical evidence. (Tr. 936.) However, on January 15, 2003, Dr. Gaw reported that the plaintiff had an esophageal dilatation in 2001. (Tr. 1207.) An esophageal dilatation is a technique used to stretch or open the blocked portion of an esophagus. The Merck Manual 745-46 (Robert Berkow et al. eds., 16th ed. 1992).

-59-

The plaintiff testified that after doing household chores or other physical activity, he would have to use his TENS Unit in order to relax his muscles and ease his pain. (Tr. 1217-18.) Moreover, every doctor the plaintiff visited recorded his use of the TENS Unit. The plaintiff also wore an arm brace given to him by Dr. Hazlewood due to his atrophy and weakness in his left arm. The plaintiff tried physical therapy on more than one occasion to help alleviate his pain; however, these sessions were generally unsuccessful. Susan Zimpfer, a physical therapist at Middle Tennessee Medical Center, noted that the while the plaintiff's flexibility and general movement were a little better, the only improvement was that the plaintiff "may be sleeping better at night." (Tr. 881.) She reported that the plaintiff still had "frequent bad days." *Id*. Another physical therapist, Frank Duchesne, stated that the plaintiff did not respond well to therapy. (Tr. 873.) The plaintiff's pain continued despite the measures taken to relieve his pain.

In sum, an analysis of the above factors does not support the ALJ's decision to discount the plaintiff's credibility. Furthermore, the ALJ did not sufficiently address the lay person testimony available in the record when determining that the plaintiff's subjective complaints of pain were not credible. Although deference must be given to the agency's determination, the ALJ is required to evaluate the record given the factors set forth in 20 C.F.R. § 404.1529(c)(3). Therefore, this case must be remanded for a reevaluation of the plaintiff's credibility by either giving sufficient weight to the factors set forth above and to

the testimony of the plaintiff's friends and family, or by providing requisite good reason

for not crediting such factors and testimony in accordance with the relevant regulations.

### 2. The plaintiff's psychological subjective complaints were not persuasive

The ALJ did not find the plaintiff's psychological subjective complaints persuasive

because the plaintiff did not seek or think he needed treatment. The ALJ also credited the

opinion of the consulting psychological examiner, Dr. Yarbrough, who found that the

plaintiff had a GAF of 55, over the evaluation of Dr. Suren, who found that the plaintiff had

a GAF of 45. [27] The defendant argues that the ALJ found the plaintiff's complaints not

persuasive and the plaintiff's mental limitations not severe because of the plaintiff's GAF

score of 55 reported by Dr. Yarbrough. (Docket Entry No. 20, at 10.) However, a GAF score

is not necessarily determinative. In fact, the Social Security Administration has cautioned:

"[The GAF scale] does not have a direct correlation to the severity requirements in our

mental disorder listings." Revised Medical Criteria for Evaluating Mental Disorders, 65

Fed.Reg. 50,746, 50,764-65 (Aug. 21, 2000). GAF is a clinician's subjective rating of an

individual's overall psychological functioning. A GAF score may help an ALJ assess mental

---

[27] The ALJ credits Dr. Yarbrough's psychological evaluation of the plaintiff as being
"more impartial" than Dr. Suren's psychological evaluation of the plaintiff. To discount the
opinions of a psychologist simply because he or she undertook the evaluation at the request
of the plaintiff's attorney is troubling. However, given the ALJ's reasoning in the sentence
preceding his assertion of "impartiality," it appears that the ALJ may have inadvertently
erred in his word choice and that he meant to address the credibility of or the weight given
to Dr. Suren's psychological evaluation.

RFC, but it is not raw medical data. Rather, it allows a mental health professional to convert medical signs and symptoms of an individual's mental functioning into a general assessment so it may be understood by a lay person. *See Smith v. Astrue*, 2008 WL 2566567 * 5 (M.D.Tenn. June 24, 2008.). Therefore, a GAF score does not conclusively discredit the plaintiff's subjective complaints regarding his depression.

However, the plaintiff's treating physicians did not sufficiently document a need for psychological treatment. Although Dr. Hazlewood prescribed Elavil for the plaintiff and even increased the dosage in November 1996 (Tr. 749-52), the plaintiff "was off" Elavil when he returned to Dr. Hazlewood in March 1999.[28] (Tr. 1112.) Nowhere in Dr. Hazlewood's treatment notes or evaluations from March 1999, through May 2001, is there any indication that the plaintiff was given additional prescriptions of Elavil. (Tr. 1101-12, 1205.) However, in January and April of 2002, Dr. Hazlewood again prescribed Elavil. (Tr. 1206-07.) Dr. West's medical records also show that he prescribed Elavil for the plaintiff on two separate occasions, the first being on June 9, 1998 (Tr. 1152) and the second, nearly three years later, on June 13, 2001. (Tr. 1147.) What is absent from these medical records is any support for any serious psychological condition or any basis for the need for sporadic prescriptions of Elavil. Without any such documentation, the Court cannot find

---

[28] Dr. Hazelwood's March 1999 evaluation noted that he had not seen the plaintiff since April 1998.

that there was not substantial evidence to support the ALJ's finding regarding the severity of the plaintiff's psychological limitations.

### 3. The ALJ did not err in rejecting the opinion of Dr. West

The plaintiff alleges that the ALJ erred in rejecting the opinion of Dr. Willard West, one of the plaintiff's treating physicians. Although there are many standards to which the ALJ must adhere in assessing medical evidence supplied in support of a claim, greater deference is usually given to the opinions of treating physicians as compared to those opinions of non-treating physicians. *See e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). This is commonly called the treating physician or treating source rule. *Id.* (citing other authority).

The treating source rule directs the Social Security Administration's analysis of a plaintiff's treating physician's opinion. If the opinion of a "treating source" is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it must receive "controlling weight." 20 C.F.R. §§ 404.2527(d)(2), 416.927(d)(2). If a treating source's opinion is not given "controlling weight," specific factors must be used to determine what weight such an opinion will receive, and "good reasons" must be given in the determination or decision to explain the resulting weight given to the treating source. *Id.* In giving "good reasons" for denying benefits, the ALJ must provide "specific reasons for the weight given

-63-

to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2p, 1996 WL 374188, at *2 (SSA July 2, 1996). The "specific reasons" must be so specific as "to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

The ALJ is to consider the following factors in deciding what weight to give medical opinions: (1) the examining relationship, (2) the treatment relationship, (3) the length of the treatment relationship, (4) supportability, and (5) specialization. *See* 20 C.F.R. § 416.927(d)(2)-(5). The Sixth Circuit has explained that the

> purpose of this procedural aspect of the treating physician rule is two-fold. First, the explanation "let[s] claimants understand the disposition of their cases," particularly where a claimant knows that his physician has deemed him disabled and therefore "might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied."

*Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004)(quoting *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson,* 378 F.3d at 544. Because of the significance of the notice requirement in ensuring that each denied plaintiff receives fair process, a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions may constitute grounds for remand, even when the ALJ's conclusion may be justified based upon the

record. *Id.* A court cannot excuse the denial of mandatory procedural protection simply because there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely. *Id.* at 546.

However, under certain limited circumstances, failure to give good reasons may not require reversal and remand, but may amount to a *de minimis* violation. *Id.* at 547. A de minimis violation does not occur when the claimant appears to have "'had little chance of success on the merits anyway.'" *Id.* at 546 (quoting *Mazaleski v. Treusdell,* 562 F.2d 701, 719 n. 41 (D.C.Cir.1977)). Instead, in *Wilson,* the Court identified the following examples of circumstances that "may not warrant reversal": (1) "if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of § 1527(d)(2)- the provision of the procedural safeguard of reasons-even though [he] has not complied with the terms of the regulation." *Wilson,* 378 F.3d at 547. *See also Heston v. Comm'r of Soc. Sec.,* 245 F.3d 528, 536 (6th Cir.2001) (holding failure to address treating source's opinion harmless error when the ALJ adopted the treating source's recommendations). However, this Court has definitively held that a "proper analysis of the factors listed in 20 C.F.R. § 416.927(d)(2)-(6) is not optional," and that "it is critical to provide 'good reasons' for the weight–or lack

-65-

thereof–afforded Plaintiff's treating sources." *Birdwell v. Barnhart*, 2008 WL 2414828, at *13 (M.D.Tenn. Jun 12, 2008)(citing *Wilson*, 378 F.3d at 546)(Nixon, J.).

It is undisputed that Dr. West qualifies as a "treating source." *See* 20 C.F.R. § 404.1502 (defining "treating source"). Dr. West began treating the plaintiff on June 9, 1998. (Tr. 1153.) Since that time and until the time of his hearing, the plaintiff saw Dr. West on eleven different occasions. On April 2, 2002, Dr. West completed a Medical Source Statement at the request of the SSA and opined that the plaintiff could lift a maximum of ten pounds, stand and/or walk less than two hours out of an eight hour day, sit less than six hours in an eight hour day, was limited in pushing and/or pulling in the upper and lower extremities, limited in regards to all manipulative functions, such as reaching in all directions, not limited in regard to visual/communicative limitations, such as seeing and hearing, and had limitations when it came to hazards such as heights. (Tr. 1192-96.)

In addressing Dr. West's opinions the ALJ found that, "[c]onsidering the general nature of the complaints for which Dr. West treated the claimant, with significant gaps in treatment and no recordation of supportive pathology, little weight can be accorded this opinion." (Tr. 935.) The ALJ further found that:

> No weight is accorded the repeated assessments by Dr. West, as noted above, that the claimant could perform a substantially limited range of sedentary work. Those assessments are in conflict with every treating, examining, and reviewing physician in the record. He is the only source who thinks the claimant's impairments limit him to less than sedentary work in every

-66-

endeavor measured. There were substantial gaps in his treatment, i.e., between June 1998 and January 2001. None of the objective tests, including x-rays, MRIs, EMG/nerve conduction studies, performed since the claimant's 1991 surgery, have shown progression of impairment, any surgical lesion, any radiculopathy, or any basis for crediting Dr. West over other physician opinions in the record.

(Tr. 937.) While the ALJ did not engage in a factor-by-factor analysis under the relevant regulations, his analysis covered each factor and offered sufficiently good reasons for not accepting the limitations assigned by Dr. West.

The ALJ also found that Dr. West, an internist, treated the plaintiff for complaints of a general nature. (Tr. 935.) The plaintiff admitted at the hearing that Dr. West was his regular family physician and that other doctors had specifically treated him for his disabling conditions. (Tr. 1243.) The plaintiff testified that Dr. Hazlewood treated his back and his neck, the "Workers Comp doctor" treated his arm, and Dr. Allen treated him for his ruptured disc and his neck. (Tr. 1243.) The plaintiff mainly complained to Dr. West of chest pain, a cough associated with sinuses, stomach problems and indigestion, blood blisters on his toe and heel, rib pain, a "jelly-like" substance in his urine, and headaches. (Tr. 1144-53.) Dr. West only once referred the plaintiff to have an image of his lumbar spine. (Tr. 1162.)

Dr. West treated the plaintiff with medication for back, neck, and shoulder pain. (Tr. 1144-53.)   Dr. West also continued the medications Dr. Hazlewood previously prescribed the plaintiff, such as Baclofin, Lortab, and Elavil. (Tr. 1153-55.) However, the ALJ

properly noted the substantial gaps in Dr. West's treatment of the plaintiff, *i.e.*, between June 1998 and January 2001 as well as between July 2001 and April 2002.

Next, the ALJ discussed the lack of support for the plaintiff's limitations as determined by Dr. West. The ALJ specifically found that Dr. West was the only source who thought the claimant's impairments limit him to less than sedentary work in every endeavor measured. The ALJ further noted that Dr. West's assessments are in conflict with every treating, examining, and reviewing physician in the record and none of the objective tests, including x-rays, MRIs, and EMG/nerve conduction studies, performed since the claimant's 1991 surgery, have shown progression of impairment, any surgical lesion, any radiculopathy, or any basis for crediting Dr. West over other physician opinions in the record.

The plaintiff's other treating physician, Dr. Hazlewood, who saw the plaintiff on a consistent basis from 1996 until 2002, did not limit the plaintiff as severely as Dr. West. Dr. Hazlewood saw the plaintiff on about seventeen different occasions over seven years, significantly more frequently than Dr. West. There were also fewer gaps in the treatment record of Dr. Hazlewood. Dr. Hazlewood's limitations were consistent with the limitations of the other physicians, including Dr. Gaw, the consulting physician. Moreover, as the ALJ noted at the hearing, two of Dr. West's opinions were inconsistent with his other opinions in regard to limitations in the plaintiff's upper extremities. (Tr. 1256.)

-68-

The plaintiff's main argument is that the ALJ erred in stating that "no weight" was afforded to the opinion of Dr. West. (Docket Entry No. 17, at 28-29.) However, the ALJ also stated that "little weight" was offered to this treating source's opinions. (Tr. 935.) While it is unclear whether "little weight" or "no weight" was assigned to the opinions of Dr. West, the ALJ properly analyzed the relevant factors sufficing to provide good reason in his rejection of this treating source's opinion.[29]

## V. CONCLUSION

The plaintiff seeks a remand for award of benefits, or, in the alternative, to remand pursuant to Sentence 4 of 42 U.S.C. §§ 405(g) and 1383(c), for future consideration. The Court is sympathetic to the length of time the plaintiff's claim has been pending and the fact that his case has already been remanded on two prior occasions. Although it is tempting, under these circumstances, to reverse and remand for an award of benefits, the Court cannot find, as it must, that there is not substantial evidence in the record to support the ALJ's decision or that there are grounds for an award of benefits under *Faucher v. Sec'y of Health and Human Serv.*, 17 F. 3d 171 (6th Cir. 1994). The Court does, however, find that the

---

[29] The Court has not addressed the third issue raised by the plaintiff concerning the plaintiff's inability to perform a full day's work, since it is tied into the unresolved issue of the plaintiff's subjective complaints of pain. Until the ALJ reviews testimony of the plaintiff and his family and friends, it cannot be determined whether the plaintiff is able to sustain work activities on a "regular and continuing basis."

ALJ failed to properly evaluate the credibility of the plaintiff's complaints as to the lay testimony and thus this case should be remanded for that reason.

## VI. RECOMMENDATION

For the above stated reasons, it is respectfully recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 17) be GRANTED to the extent that the case should be remanded to the ALJ to properly evaluate the plaintiff's subjective complaints of pain and the lay testimony as set forth in section IV (c)(1) above. *See also supra* n. 29.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge

-70-